**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MICHELLE R. CICCIA, | CASE NO. 1:14-cv-01552-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND FOR FURTHER PROCEEDINGS |
| Defendant. | |
| | Docs. 1, 10, 11, 16, 17, 20 |

## REPORT AND RECOMMENDATION

### I.     Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Michelle R. Ciccia for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). In this case, Plaintiff suffered from obesity, obstructive sleep apnea, multiple sclerosis, degenerative disc disease of the cervical, lumbar and thoracic spines, bilateral carpal tunnel syndrome, degenerative joint disease-tendonitis of light shoulder, brachial plexus lesions, insomnia, major depressive disorder and anxiety disorder. The administrative law

judge ("ALJ") found that Plaintiff could perform a range of sedentary work. The regulations under the Act, 20 C.F.R. §§404.1 *et seq.*, 416.101 *et seq.* ("Regulations") define sedentary work as requiring six hours of sitting out of an eight-hour work day and two hours of standing or walking out of an eight-hour work day. Thus, although the work is characterized as sedentary, a claimant generally must retain some ability to stand and walk. In this case, both Plaintiff's treating physician and the state agency physician opined that she could stand or walk for less than one hour. Consequently, the ALJ's assessment of Plaintiff's physical function exceeded all of the medical expert opinions with regard to standing and walking. Only rarely can an ALJ craft an RFC without a supporting medical opinion, and an ALJ generally may not independently review the medical evidence and use lay inferences to supplant to opinions of competent professionals. The ALJ chose not to have a non-examining state agency physician review the evidence. Thus, the ALJ erred in rejecting the opinions of the consultative examiner and Plaintiff's treating physician in finding that she could walk for two hours out of an eight-hour workday.

A vocational expert ("VE") testified that there were some jobs that Plaintiff could perform with a sit/stand option, but the ALJ did not include a sit/stand option in the assessment of Plaintiff's physical function. The VE's testimony does not render the ALJ's decision harmless, because it conflicts with the Dictionary of

Occupational Titles ("DOT") which does not allow for a sit/stand option and indicates that the positions identified by the VE that Plaintiff could perform require two hours of standing or walking each day. When the VE testimony conflicts with the DOT, the ALJ generally must elicit testimony regarding the conflict and explicitly make a finding resolving the conflict. The ALJ made no such finding here. This precludes meaningful review. As a result, the Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter be remanded for further proceedings.

## II.   Procedural Background

On January 14, 2010, a previously filed application for benefits under the Act was denied by an ALJ. (Tr. 105-119). On May 19, 2011, Plaintiff filed an application for DIB under the Act. (Tr. 157-58). On September 15, 2011, the Bureau of Disability Determination denied Plaintiff's application (Tr. 120-34), and Plaintiff filed a request for a hearing on October 12, 2011.  (Tr. 142-43). On March 8, 2012, Plaintiff filed an application for SSI under the Act. (Tr. 168). On January 10, 2013, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 68-104).  On April 29, 2013, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 21-46). On May 7, 2013, Plaintiff filed a request for review with the Appeals Council (Tr. 18-20), which the Appeals Council denied on June 10, 2014,

thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On August 7, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On October 31, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 10, 11). On February 10, 2015, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 16). On March 16, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 17). On April 14, 2015, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 20). On June 23, 2015, the Court referred this case to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and requires only "more than a mere

scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.   The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2)

whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### V. Relevant Facts in the Record

Plaintiff was born on April 19, 1981 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 40). Plaintiff has at least a high school education and past relevant work as an activities assistant and retail assistant manager. (Tr. 40). Plaintiff's appeal

primarily addresses her physical impairments, so the Court will limit it's

discussion of the medical evidence accordingly. (Pl. Brief, Pl. Reply).

Additionally, res judicata applies to the period before January 14, 2010, the date on

which a prior application was denied by an ALJ. (Tr. 105-119). Plaintiff initially

alleged onset of January 15, 2010, but amended her onset date to January 31, 2011

at the hearing. (Tr. 72-74).

## A. Function Report and Testimony

In a function report dated July 27, 2011, Plaintiff asserted that her

impairments affect her ability to sit, stand, and walk, among other physical

functions. (Tr. 235). She admitted that she cared for her child, but explained that

family and friends frequently have to come help her. (Tr. 231). She reported that

she can walk for 500 feet before needing to stop and rest. (Tr. 235). She explained

that she had undergone "experimental" chemotherapy in the late 1990s that had

subsequently been stopped due to "high toxicity" and that she felt like she was

ninety years-old. (Tr. 237). She explained that bending, standing and walking

exacerbated her pain. (Tr. 239).

At a hearing on January 10, 2013, Plaintiff testified that she had become

more limited since submitting the function report. (Tr. 79). She testified that she

could stand for thirty minutes "uncomfortably" and could walk less than a quarter

of a mile. (Tr. 80). She testified that she had sold adult novelty products, but not

any longer, and occasionally traveled to Atlantic City. (Tr. 83-86). She also testified to significant symptoms of anxiety and depression. (Tr. 81). She indicated that her daughter was in kindergarten, was "fairly self-sufficient," and her mother, who lives a quarter-of-a mile down the road, helps her a lot with her daughter. (Tr. 77). She testified that she lived with her boyfriend and could not do household chores on her own. (Tr. 76-77). At the hearing, Plaintiff's attorney amended her onset date to January 31, 2011, when she had her first flare of multiple sclerosis symptoms. (Tr. 73).

## B. Medical Evidence

Defendant argues that the ALJ correctly concluded that the objective medical evidence contradicted the medical opinions. (Def. Brief at 3-5). Defendant cites only the following medical records. *Id.*

On January 26, 2010, prior to Plaintiff's diagnosis of multiple sclerosis and prior to her alleged onset date, she presented to Dr. Vinit Pande, M.D. at Northeastern Rehabilitation Associates. (Tr. 856). Plaintiff complained of right shoulder pain and had decreased strength in her right shoulder. (Tr. 856). Her examination was otherwise normal. (Tr. 856). She was scheduled for an MRI of her right shoulder. (Tr. 856).

On October 3, 2011, Plaintiff presented to Dr. Pande. (Tr. 965). She continued to complain of muscle spasm and indicated that injections provided only

three weeks of relief. (Tr. 965). On examination, she had "diffuse bilateral fibromyalgia tender points…lumbar spasm noted…strength 5/5 in both lower extremities. Slow transfers and ambulation." (Tr. 965). Plaintiff's Lyrica prescription was increased and she was scheduled for additional testing. (Tr. 965).

On December 8, 2011, Plaintiff presented to Dr. Pande. (Tr. 964). On examination she had "[d]iffuse fibromyalgia tender points along with bilateral lumbar paraspinal spasm. Lumbar flexion and extension with 50% deficit." (Tr. 964). Plaintiff was prescribed physical therapy but was experiencing insurance certification problems. (Tr. 964). She was instructed to follow-up in eight weeks. (Tr. 964).

On January 24, 2012, Plaintiff presented to Dr. Pande. (Tr. 962). She indicated that her medications "help her fibromyalgia pain" and denied side effects of medications, although she indicated that "she may run out of her medication benefits." (Tr. 962). Plaintiff had "bilateral cervical paraspinal and upper trap spasm tenderness. Additional multiple fibromyalgia tender points." (Tr. 962). He assessed her to have "fibromyalgia flare up" and "chronic cervical and lumbar myofascial pain with spasm." (Tr. 962). He instructed her to continue her medications and scheduled her for MRIs. (Tr. 962).

On February 1, 2012, Plaintiff followed-up with Nathan Carr, PA-C, at Dr. Vergari's office. (Tr. 934). Mr. Carr noted that:

> She has a known past medical history of lumbar degenerative disc disease, fibromyalgia, primary headache syndrome, sleep apnea on CPAP and status-post urethral CA with toxic polyneuropathy. She does have history of headache, generalized and often emanating from the occipital region. Headache is quite frequent. There are complaints of widespread fatigue and discomfort. She notes "shocks" which will shoot from the base of the skull to the midback. She has listed these complaints, which I have scanned into the chart.

(Tr. 934). On examination, Plaintiff was "in a chronic degree of pain and discomfort." (Tr. 935). She had "cervical and trapezius muscle spasm, limitation of neck movement to both horizontal planes." (Tr. 935). She had facet tenderness in her cervical spine, multilevel cervical root tenderness, "fullness and edema" in her brachial plexus, EARB's point tenderness bilaterally, "[l]umbosacral paraspinal muscle spasm," facet tenderness in her lumbar spine, and tenderness in her right sacroiliac joint. (Tr. 935). Plaintiff had decreased grip strength. (Tr. 935). Her sensation was decreased to pinprick in "stocking-glove distribution." (Tr. 932). Plaintiff's reflexes were "essentially trace throughout" with positive Tinel and Phalen signs. (Tr. 935). Plaintiff was scheduled for additional imaging tests. (Tr. 935).

On February 8, 2012, an MRI of Plaintiff's brain indicated "[m]ultiple (30-40) foci of T2/FLAIR hyperintensity as above, compatible with demyelinating disease." (Tr. 945).

On February 13, 2012, an MRI of Plaintiff's cervical spine indicated "[c]omplete straightening of normal lordosis compatible with spasm…At C4-C5,

small central protrusion measuring 2 mm in AP dimension deforms the ventral

thecal sac results in loss of CSF spaces ventral to the cord. No significant resulting

canal or foraminal stenosis…At C5-C6, there is mild uncovertebral joint

hypertrophy in the left. There is no canal or foraminal stenosis…At C6-C7, there is

a minimal 1 mm in AP dimension broad-based protrusion without resulting canal

or foraminal stenosis." (Tr. 943-44).

On March 9, 2012, Plaintiff followed-up with Nathan Carr, PA-C, at Dr.

Vergari's office. (Tr. 931). Mr. Carr noted that:

> MRI brain has shown multiple T2 hyperintensities and Dawson
> fingers consistent with demyelination. MRI cervical did shown disc
> herniations at C4-5, C5-6 and C6-7. Evoked potential studies were
> normal, except lower extremity which has shown prolongation of the
> P40 intervals. Ambulatory EEG was negative. She is not currently on
> disease-modifying therapy at this time. She is complaining of lumbar
> spinal discomfort. The patient has been under the care of Pain
> Management, whom has performed PT and injection therapy with
> only mild relief. She has had increasing right lower extremity
> discomfort and paresthesia.

(Tr. 931). On examination, Plaintiff was "in a chronic degree of pain and

discomfort." (Tr. 931). She had "cervical and trapezius muscle spasm, limitation

of neck movement to both horizontal planes." (Tr. 931). She had facet tenderness

in her cervical spine, multilevel cervical root tenderness, "fullness and edema" in

her brachial plexus, EARB's point tenderness bilaterally, "severe lumbosacral

paraspinal muscle spasm," facet tenderness in her lumbar spine, tenderness in her

right sacroiliac joint, and a positive straight leg raise on the right. (Tr. 931-32).

Plaintiff had decreased grip strength and decreased range of motion in her ankles. (Tr. 932). Her sensation was decreased to pinprick in "stocking-glove distribution." (Tr. 932). Plaintiff's reflexes were "absent to trace throughout." (Tr. 932). Plaintiff was scheduled for additional imaging and her medications were continued. (Tr. 932).

On March 30, 2012, Plaintiff followed-up with Mr. Carr in Dr. Vegari's office. (Tr. 928). On examination, Plaintiff was "in a chronic degree of pain and discomfort." (Tr. 928). She had  "cervical and trapezius muscle spasm, limitation of neck movement to both horizontal planes." (Tr. 928). She had facet tenderness in her cervical spine, multilevel cervical root tenderness, "fullness and edema" in her brachial plexus,  EARB's point tenderness bilaterally, "severe lumbosacral paraspinal muscle spasm," facet tenderness in her lumbar spine, tenderness in her right sacroiliac joint, and a positive straight leg raise on the right.  (Tr. 928-29). Plaintiff had decreased grip strength and decreased range of motion in her ankles. (Tr. 929). Her sensation was decreased to pinprick in "stocking-glove distribution." (Tr. 929). Plaintiff's reflexes were "absent to trace throughout." (Tr. 929). Plaintiff was scheduled for additional imaging for  multiple sclerosis and her medications were continued. (Tr. 926).

On April 9, 2012, Plaintiff presented to Dr. Pande for fibromyalgia and low back pain. (Tr. 960). Plaintiff indicated that she was unable to obtain aquatic

therapy and was not able to pursue other options due to her insurance status. (Tr. 960). On examination, Dr. Pande observed "Diffuse fibromyalgia tender points bilaterally. Additionally, lumbar spasm noted." (Tr. 960). He also observed that she was using a single point cane. (Tr. 960). He assessed her to have "multiple sclerosis with gait dysfunction," "myofascial pain and spasm," and fibromyalgia. (Tr. 960). He instructed her to continue her medications and continue chiropractic therapy once a week. (Tr. 960).

On April 18, 2012, an MRI of Plaintiff's lumbar spine indicated "[l]evoscoliosis…LS-S1 annular change is seen…a shallow central and left paracentral disc herniation…mild left foraminal stenosis. Canal is patent. Hypertrophic facet disease contributes.. At L4-L5 diffuse disc bulge is seen. Foramina are mildly narrowed. Canal is patent. Hypertrophic facet disease contributes…At L3-L4 disc bulge is seen. Foramina are mildly narrowed. Canal is patent." (Tr. 941).

On May 7, 2012, Plaintiff followed-up with Nathan Carr, PA-C, at Dr. Vergari's office. (Tr. 925). On examination, Plaintiff was "in a chronic degree of pain and discomfort." (Tr. 925). She had  "cervical and trapezius muscle spasm, limitation of neck movement to both horizontal planes." (Tr. 922). She had facet tenderness in her cervical spine, multilevel cervical root tenderness, "fullness and edema" in her brachial plexus,  EARB's point tenderness bilaterally, "severe

lumbosacral paraspinal muscle spasm," facet tenderness in her lumbar spine, tenderness in her right sacroiliac joint, and a positive straight leg raise on the right. (Tr. 925-26). Plaintiff had decreased grip strength and decreased range of motion in her ankles. (Tr. 926). Her sensation was decreased to pinprick in "stocking-glove distribution." (Tr. 926). Plaintiff's reflexes were "absent to trace throughout." (Tr. 926). Plaintiff was prescribed Detrol for multiple sclerosis and her other medications were continued. (Tr. 926).

On May 30, 2012, an MRI of Plaintiff's thoracic spine indicated "mild multilevel spondylosis...demonstrated by disc dehydration" and "[s]mall anterior osteophytes." (Tr. 939-40).

On July 5, 2012, Plaintiff followed-up with Nathan Carr, PA-C, at Dr. Vergari's office. (Tr. 922).  On examination, Plaintiff was "in a chronic degree of pain and discomfort." (Tr. 922). She had  "cervical paraspinal muscle spasm, limitation of neck movement to both horizontal planes, cervical and trapezius muscle spasm." (Tr. 922). She had facet tenderness in her cervical spine, multilevel cervical root tenderness, "fullness and edema" in her brachial plexus,  EARB's point tenderness bilaterally, "severe lumbosacral paraspinal muscle spasm," facet tenderness in her lumbar spine, tenderness in her right sacroiliac joint, and a positive straight leg raise on the right.  (Tr. 922-23). Plaintiff had decreased grip strength and decreased range of motion in her ankles. (Tr. 923). Her sensation was

decreased to pinprick in "stocking-glove distribution." (Tr. 923). Plaintiff's reflexes were "absent to trace throughout." (Tr. 923). Mr. Carr noted that Plaintiff "was previously on vincristine resulting in panhyporeflexia." (Tr. 923). Her Tinel and Phalen signs were bilaterally positive. (Tr. 923). Plaintiff was scheduled for additional imaging studies for carpal tunnel syndrome. (Tr. 920). Her medications[1] were continued, and she was also started on Avonex for multiple sclerosis. (Tr. 923).

On August 23, 2012, an EMG of Plaintiff's bilateral upper extremities indicated "an abnormal EMG of the bilateral upper extremity and is most consistent with: Left C6 root irritation of acute in nature. Bilateral median motor and sensory peripheral neuropathy of primarily demyelinating in nature across both wrists, consistent with bilateral carpal tunnel syndrome of mild degree."

On October 3, 2012, Plaintiff followed-up with Amanda Beck, PA-C at Dr. Vergari's office. (Tr. 919). Ms. Beck observed that Plaintiff:

> [C]ontinues to have neck pain that radiates into her upper extremities bilaterally with parasthesias. She has mid-back pain between her shoulder blades. She has lower back pain that radiates into her lower extremities bilaterally with parasthesias. She gets a headache every day with the pain radiating from the occipital region of her head to the frontal region of her head. She admits to nausea and sensitivity to light and sound with the headaches. She states that she has bilateral ear pain, for which she saw her family doctor and was not found to

---

[1]Detrol, Lyrica, Cymbalta, Tizanidine HCl, Reglan, Zanaflex, Hydrochlorothiazide, Metformin, Spironolactone, Vicodin, Aciphex. (Tr. 923).

> have an ear infection. Upper EMG showed left C6 nerve root irritation
> and bilateral carpal tunnel syndrome.

(Tr. 919). On examination, Plaintiff was "in a chronic degree of pain and discomfort." (Tr. 919). She had "[s]evere cervical paraspinal muscle spasm, limitation of neck movement to both horizontal planes, cervical and trapezius muscle spasm." (Tr. 919). She had facet tenderness in her cervical spine, multilevel cervical root tenderness, "fullness and edema" in her brachial plexus, EARB's point tenderness bilaterally, "moderate lumbosacral paraspinal muscle spasm," facet tenderness in her lumbar spine, tenderness in her sacroiliac joints bilaterally, and moderate thoracic paraspinal muscle spasm. (Tr. 920). Plaintiff had decreased grip strength and decreased range of motion in her ankles. (Tr. 920). Her sensation was decreased to pinprick in "stocking-glove distribution." (Tr. 920). Plaintiff's reflexes were "absent to trace throughout." (Tr. 920). Her Tinel and Phalen signs were bilaterally positive. (Tr. 920). Plaintiff was scheduled for additional imaging studies and injections as she had "failed conservative treatments, including physical therapy and pharmacotherapy." (Tr. 920). She was also prescribed bilateral wrist splints "for use at night and with repetitive movement" for her carpal tunnel symptoms. (Tr. 920).

On December 6, 2012, Plaintiff followed-up with Amanda Beck, PA-C at Dr. Vergari's office. (Tr. 1059). She reported that she:

> [H]ad one cervical facet injection with minimal improvement of pain and spasm. She continues to have neck and back pain that radiates into her upper and lower extremities bilaterally with parasthesias. Her headaches have improved with pharmacotherapy. She continues on the weight loss program and has recently quit smoking for bariatric surgery. MRI of the IAC showed multiple foci of T21/FLAIR hyperintensity as above, highly suspicious for demyelinating disease.

(Tr. 1059). On examination, Plaintiff was "in a chronic degree of pain and discomfort." (Tr. 1059). She had "[s]evere cervical paraspinal muscle spasm, limitation of neck movement to both horizontal planes, cervical and trapezius muscle spasm." (Tr. 1059). She had facet tenderness in her cervical spine, multilevel cervical root tenderness, "fullness and edema" in her brachial plexus, EARB's point tenderness bilaterally, "severe lumbosacral paraspinal muscle spasm," facet tenderness in her lumbar spine, tenderness in her sacroiliac joints bilaterally, and moderate thoracic paraspinal muscle spasm. (Tr. 1060). Plaintiff had decreased grip strength and decreased range of motion in her ankles. (Tr. 1060). Her sensation was decreased to pinprick in "stocking-glove distribution." (Tr. 1060). Plaintiff's reflexes were "absent to trace throughout." (Tr. 1060). Her Tinel and Phalen signs were bilaterally positive. (Tr. 1060).

At some point subsequent to the ALJ hearing on January 10, 2013, Dr. Ferraro authored a letter that states:

> Ms. Ciccia had two clinical attacks with neurological symptoms which responded to IV steroids. Her MRI reveals multiple lesions ,in locations typical of demyelinating disease. Based on this clinical evidence I am comfortable giving her a diagnosis of multiple

sclerosis. Other blood tests and lumbar puncture were performed to evaluate for other causes of central nervous system demyelinating disease, such as autoimmune and infectious causes; this work up was unremarkable. Although CSF oligoclonal bands were negative, they are not found in 10-15% of patients with multiple sclerosis. This does not change her diagnosis. She should continue immunomodularity therapy with Copaxone and continue to have neurology follow up.

(Tr. 1137).

## C. Opinion Evidence

On September 1, 2011, Plaintiff presented to state agency physician Dr. Joyce Vrabec, D.O., for a consultative examination. (Tr. 915). Plaintiff reported degenerative disc disease causing pain treated by a specialist with injections and medications, fibromyalgia causing pain in her entire body treated by a rheumatologist, and a history of "possible peripheral neuropathy secondary to chemotherapy given for treatment of a uretral cancer a number of years ago." (Tr. 915). Dr. Vrabec observed that Plaintiff was morbidly obese. (Tr. 915). Plaintiff's medications included:

> Hydrochlorothiazide 25 mg once a day , metformin 500 mg twice a day nortriptyline 25 mg daily , Aldactone 50 mg twice a day, Reglan as needed for migraines,  baclofen 10 mg half tablet three times a day as needed for back spasm, Vicodin 1-3 times a day as needed, ibuprofen as needed, chloral hydrate liquid as needed for sleep disorder , which she states is not working , Lyric8 .75 mg one in t he morning and three at night , Cymbalta total of 90 mg daily , Xanax 0.5 mg as needed , and Wellbutrin 500 mg daily.

(Tr. 916). On examination, Dr. Vrabec observed that Plaintiff had a "completely normal ability to get in and out of her car, on and off of the examination table, and

in and out of the chair. Ambulation is noted to be completely normal." (Tr. 917).

Plaintiff had normal range of motion in her neck but "complain[ed] of a lot of pain

at the extreme range of motion testing." (Tr. 917). Plaintiff had normal range of

motion in her back and a negative straight leg raise, but "complain[ed] of very

significant pain even when [Dr. Vrabec] barely touch[ed] her shirt, most especially

in the paraspinal area of her lumbosacral spine." (Tr. 917). Plaintiff complained of

"pain on any motion testing of all of every single joint in her upper and lower

extremities." (Tr. 917). Plaintiff's strength was 5/5 and her reflexes were 2/4. (Tr.

917). Plaintiff seemed to have "no problem with ambulation." (Tr. 918). Dr.

Vrabec opined that Plaintiff could occasionally lift and carry up to twenty-five

pounds, stand and walk for one hour or less out of an eight-hour day, sit for eight

hours with "alternating sit/stand at his/her option," and never perform postural

activities. (Tr. 910). Plaintiff had no limitations in pushing, pulling, other physical

function, or environmental restrictions. (Tr. 910).

On January 15, 2013, Dr. Vergari authored a medical opinion. (Tr. 1118).

He opined that Plaintiff frequently lift and carry less than ten pounds. (Tr. 1116).

He opined that Plaintiff stand or walk for less than two hours out of an eight-hour

work day and sit for less than two hours out of an eight-hour workday. (Tr. 1116).

He opined that she could only sit for ten minutes at a time before needing to

change positions and only stand for five minutes at a time before needing to

change positions. (Tr. 1116). He opined that Plaintiff would need to "lie down at unpredictable intervals…several times a day." (Tr. 1117). He opined that Plaintiff could occasionally climb stairs but never twist, stoop, crouch or climb ladders. (Tr. 1117). He opined that Plaintiff's ability to reach, handle, finger, feel, push and pull was limited due to her diagnoses of multiple sclerosis and degenerative disc disease, as demonstrated by MRI and EMG findings. (Tr. 1117). He opined that Plaintiff's diagnoses caused environmental restrictions and that she would need to use a cane as needed for assistance with ambulation. (Tr. 1118). He opined that she would be absent more than three times per month as a result of her impairments. (Tr. 1118).

## D. ALJ Findings

On April 29, 2013, the ALJ issued the decision. (Tr. 42). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 31, 2011, the alleged onset date, and was insured through December 31, 2011. (Tr. 27). At step two, the ALJ found that Plaintiff's obesity, obstructive sleep apnea, multiple sclerosis, degenerative disc disease of the cervical, lumbar and thoracic spines, bilateral carpal tunnel syndrome, degenerative joint disease-tendonitis of light shoulder, brachial plexus lesions, insomnia, major depressive disorder and anxiety disorder were medically determinable and severe.  (Tr.27).

At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 27).

In crafting the RFC, the ALJ assigned limited weight to Dr. Vergari's opinion

solely because "it was not supported by the objective medical evidence of record."

(Tr. 36). The ALJ assigned little weigh to Dr. Vrabec's opinion regarding standing,

walking and postural activities solely because it "was not supported by the physical

examination including normal gait and muscle strength was 5/5 bilaterally." (Tr.

35). Thus, the ALJ found that Plaintiff had the RFC to perform:

> [S]edentary work as defined in 20 CFR 404.1567(a) and 416.967(a);
> however, her ability to work at that level is redcued [sic] in that she is
> limited to occupations that require no more than occasional postural
> maneuvers, such as balancing, stooping, kneeling, crouching and
> climbing on ramps and stairs. She must avoid occupations that require
> climbing on ladders, ropes and scaffolds or crawling. She is limited to
> occupations that require no more than occasional overhead lifting,
> pushing and pulling with the upper extremities to include the
> operation of hand levers and overhead work. Claimant is limited to
> occupations that require no more than occasional pushing and pulling
> with the lower extremities to include the operation of pedals. She must
> avoid concentrated prolonged exposure to fumes, odors, dusts, gases,
> chemical irritants, environments with poor ventilation, temperature
> extremes and extreme dampness and humidity. She is limited to
> occupations requiting no more than simple, routine tasks, not
> performed in a fast paced production environment involving only
> simple, work relate decisions, and in general, relatively few work
> place changes.

(Tr. 29). At step four, the ALJ found that Plaintiff could not perform her past

relevant. (Tr. 40). At step five, the ALJ found that Plaintiff could perform other

work in the national economy as a reception/information clerk, a general office

clerk, and an order clerk. (Tr. 41).  Consequently, the ALJ found that Plaintiff was

not disabled and not entitled to benefits. (Tr. 41).

## VI.     Plaintiff Allegations of Error

### A.     Evaluation of the medical opinions

The ALJ erred in assigning little weight to Dr. Vegari's opinion. First, the

ALJ failed to provide a sufficiently specific reason to reject Dr. Vegari's opinion.

The ALJ wrote only that it was "it was not supported by the objective medical

evidence of record." (Tr. 36).Under the Regulations, 20 C.F.R. 404.1527(c) states

that the ALJ "will evaluate every medical opinion we receive." *Id.* There is a

heightened requirement in Section 1527(c)(2), which applies only to treating

physicians. Section 1527(c)(2) states that  ALJs  "will *always give good reasons* in

[the] *notice of determination or decision* for the weight we give your treating

physician's opinion." *Id.* (emphasis added). *See also Ray v. Colvin*, 1:13-CV-0073,

2014 WL 1371585, at *21 (M.D. Pa. Apr. 8, 2014) ("The cursory manner in which

the ALJ rejected Dr. Jacob's opinions runs afoul of the regulation's requirement to

" give good reasons" for not crediting the opinion of a treating source upon

consideration of the factors listed above. While there may be sufficient evidence in

the record to support the ALJ's ultimate decision that Plaintiff was not under a

disability, and, thus, the same outcome may result from remand, the court cannot

excuse the denial of a mandatory procedural protection on this basis.").

Second, Dr. Vergari's opinion that Plaintiff was not capable of standing for two hours in an eight-hour workday was corroborated by Dr. Vrabec's opinion, a state agency consultative examining opinion that was the only other opinion in the record. (Tr. 910-917, 1116-1118). Thus, the ALJ concluded that Plaintiff could stand or walk for two hours out of an eight hour work-day without the benefit of a medical opinion supporting that conclusion. Generally, an ALJ may not reject all of the medical opinions in the record and assess an RFC that is greater than found by the medical professionals. As Courts in this District have repeatedly emphasized:

> The Court recognizes that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. *See Burnett v. Commissioner of Social Sec. Admin.,* 220 F.3d 112, 121–122 (3d Cir.2000). However, rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. *See Doak v. Heckler,* 790 F.2d 26, 29 (3d Cir.1986) ("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a).

*Gormont v. Astrue*, 3:11-CV-02145, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013) (Nealon, J.); *see also Bloomer v. Colvin*, 3:13-CV-00862, 2014 WL 4105272, at *5 (M.D. Pa. Aug. 19, 2014) (Jones, J.); *House v. Colvin*, 3:12-CV-02358, 2014 WL 3866072, at *8 (M.D. Pa. Aug. 6, 2014) (Kane, J.); *Muhaw v.*

*Colvin*, CIV.A. 3:12-2214, 2014 WL 3743345, at *15 (M.D. Pa. July 30, 2014) (Mannion, J.). *Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014) (Mariani, J.); *Arnold v. Colvin*, 3:12-CV-02417, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014) (Brann, J.); *Kaumans v. Astrue*, 3:11-CV-01404, 2012 WL 5864436, at *12 (M.D. Pa. Nov. 19, 2012) (Caputo, J.); *Troshak v. Astrue*, 4:11-CV-00872, 2012 WL 4472024, at *7-8 (M.D. Pa. Sept. 26, 2012) (Munley, J.); *Shedden v. Astrue*, 4:10-CV-2515, 2012 WL 760632, at *11 (M.D. Pa. Mar. 7, 2012) (Rambo, J.); *Duvall-Duncan v. Colvin*, 1:14-CV-17, 2015 WL 1201397, at *11 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.); *McKean v. Colvin*, 1:13-CV-2585, 2015 WL 1201388, at *8 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.); *Hawk v. Colvin*, 1:14-CV-337, 2015 WL 1198087, at *12 (M.D. Pa. Mar. 16, 2015) (Conner, C.J.).

Judge Mariani confronted a very similar set of facts in *Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014):

> The ALJ's decision to reject the opinions of Maellaro's treating physicians created a further issue; the ALJ was forced to reach a residual functional capacity determination without the benefit of any medical opinion.
> …
> The ALJ's decision to discredit, at least partially, every residual functional capacity assessment proffered by medical experts left her without a single medical opinion to rely upon. For example, three physicians opined that Maellaro was limited in some way in his ability to stand and/or walk: Dr. Dittman opined that Maellaro could stand/walk for less than one hour, Dr. Singh believed that Maellaro could stand/walk for fewer than two hours, and Dr. Dawson opined

that Maellaro could not stand or walk for any length of time. Tr. 183, 211, 223. In rejecting these three opinions, there were no other medical opinions upon which the ALJ could base her decision that Maellaro essentially had no limitations in his ability to stand or walk. Tr. 283. Consequently, the ALJ's decision to reject the opinions of Drs. Singh and Dawson, and the ALJ's determination of Maellaro's residual functional capacity, cannot be said to be supported by substantial evidence.

*Maellaro v. Colvin*, 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014); *see also* Bloomer v. Colvin, 3:13-CV-00862, 2014 WL 4105272, at *6 (M.D. Pa. Aug. 19, 2014) (Jones, J.); ("The ALJ did not cite to a single medical opinion that contradicted [the treating source] opinion; thus, the ALJ improperly set his "own expertise against that of a physician who present[ed] competent medical evidence.' Consequently, the AJL's residual functional capacity determination is not supported by substantial evidence.") (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (2d Cir.1999)).

This is not one of those "rare" cases when the ALJ may craft an RFC in excess of all of the medical opinions. The ALJ made other errors and the medical evidence was not unambiguous. Although it is within the ALJ's responsibility to assign weight to medical opinions, the ALJ may not assign little weight to the opinion of a treating physician for the wrong reason. In *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000), the Third Circuit set forth the standard for evaluating the opinion of a treating physician, and identified examples of the wrong reasons to reject a treating source opinion, stating that:

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer [v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999)] (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir.1994); *Jones*, 954 F.2d at 128; *Allen v. Bowen*, 881 F.2d 37, 40-41 (3d Cir.1989); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Brewster*, 786 F.2d at 585. The ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. See *Adorno*, 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent*, 710 F.2d at 115.

*Id.* at 317-318.

The Third Circuit has explained:

By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence. Again, if the ALJ believed that Dr. Scott's reports were conclusory or unclear, it was incumbent upon the ALJ to secure additional evidence from another physician.

*Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). Similarly:

Dr. Erro's observations that Morales is "stable and well controlled with medication" during treatment does not support the medical conclusion that Morales can return to work. Dr. Erro, despite his notation, opined that Morales's mental impairment rendered him

markedly limited in a number of relevant work-related activities. Other information in the treatment records supports this opinion. Thus, Dr. Erro's opinion that Morales's ability to function is seriously impaired or nonexistent in every area related to work shall not be supplanted by an inference gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting.

*Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000).

The objective medical evidence was not unambiguous. Although Plaintiff frequently had normal muscle strength testing, she also often had muscle spasm and fibromyalgia trigger points. (Tr. 960-65). She had decreased range of motion and was observed to walk with a cane. *Id.* Many abnormalities were documented in her brain, cervical spine, thoracic spine, and lumbar spine. (Tr. 939-44). She was certainly not asymptomatic, and an ALJ has no training to determine what symptoms are necessary or relevant to functional limitations.

Dr. Vergari, who has medical training, concluded that objective evidence supported his opinion, such as MRI and EMG findings. (Tr. 1116-1118). In the treatment record from Dr. Vergari's office in December of 2012, shortly before his opinion in January, 2013, Plaintiff was "in a chronic degree of pain and discomfort." (Tr. 1059). She had "[s]evere cervical paraspinal muscle spasm, limitation of neck movement to both horizontal planes, cervical and trapezius muscle spasm." (Tr. 1059). She had facet tenderness in her cervical spine, multilevel cervical root tenderness, "fullness and edema" in her brachial plexus,

EARB's point tenderness bilaterally, "severe lumbosacral paraspinal muscle spasm," facet tenderness in her lumbar spine, tenderness in her sacroiliac joints bilaterally, and moderate thoracic paraspinal muscle spasm. (Tr. 1060). Plaintiff had decreased grip strength and decreased range of motion in her ankles. (Tr. 1060). Her sensation was decreased to pinprick in "stocking-glove distribution." (Tr. 1060). Plaintiff's reflexes were "absent to trace throughout." (Tr. 1060). Her Tinel and Phalen signs were bilaterally positive. (Tr. 1060). Plaintiff was scheduled for additional injections as she had "failed conservative treatments, including physical therapy and pharmacotherapy." (Tr. 1060). She was also prescribed bilateral wrist splints "for use at night and with repetitive movement" for her carpal tunnel symptoms. (Tr. 1060).

The ALJ, who does not have medical training, concluded that objective evidence did not support his opinion. (Tr. 27-42). Thus, the ALJ "independently review[ed] and interpret[ed] the laboratory reports" and "impermissibly substituted his own judgment for that of a physician" and "set [her] own expertise against that of a physician who presents competent evidence." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). The ALJ's conclusion that Plaintiff's normal muscle strength and ambulation during the consultative examination undermine Dr. Vergari's opinion constitutes an "inference gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany

the work setting." *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). The ALJ did not provide any other reason to reject these opinions. Thus,  the ALJ rejected the opinions for the "wrong reason," and consequently, the RFC assessment lacks substantial evidence. *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000).

Defendant notes that Plaintiff cared for her three-year-old daughter, drove, shopped, read, used the computer, prepared simple meals, handled her finances, and performed light household chores, but none of these contradict the key physical limitation: Plaintiff's inability to stand or walk for more than one hour out of an eight-hour work day. (Def. Brief at 1-2). She admitted that she cared for her child, but explained that family and friends frequently have to come help her. (Tr. 231).   Each of these activities can be performed with minimal standing and walking. *See Fargnoli v. Massanari*, 247 F.3d 34, 44 (3d Cir. 2001) ("Fargnoli's trip to Europe in 1988 cannot be the basis for a finding that he is capable of doing a light exertional job because sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity"); *Smith v. Califano,* 637 F.2d 968, 971-72 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity. Smith's activities are miniscule when compared to a plethora of cases which have held that there was total disability even when the claimant was far more active than

Smith. It is well established that sporadic or transitory activity does not disprove disability.").

Moreover, an ALJ may not reject a treating physician's opinion "due to his or her own credibility judgments." *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000). Regardless, the ALJ did not cite to Plaintiff's activities of daily living to assign limited weight to the work-preclusive opinions of Dr. Vergari and Dr. Vrabec. *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (Although a Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," review must be based on "the administrative record [that was] already in existence" before the agency, not "some new record made initially in the reviewing court or post-hoc rationalizations made after the disputed action).

At the hearing, the VE testified that Plaintiff could perform jobs in the national economy with a sit/stand option. However, the ALJ did not include a sit/stand option in the RFC. The VE's testimony does not render the ALJ's failure to adequately address Plaintiff's ability to stand and walk harmless because it conflicts with the DOT. SSR 00-4p states:

> The Responsibility To Ask About Conflicts
>
> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any

possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:

- Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
- If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

Explaining the Resolution

When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

*Id.* In the Third Circuit, where there is an apparent, unresolved conflict about every position identified by the VE, remand is generally required. *See Boone v. Barnhart*, 353 F.3d 203, 208 (3d Cir. 2003), as amended (Dec. 18, 2003) (Remanding where, "according to the DOT, [claimant could not] perform any of the occupations identified by the VE"); *cf. Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir. 2005) (Declining to remand where "inconsistencies [were] not present as to each of the jobs that the expert did list"). Here, the ALJ an unresolved conflict exists that was not addressed by the ALJ.

First, none of the DOT codes identified by the ALJ match the titles identified by the ALJ. The code for what the ALJ describes as a "reception/information clerk" is titled "TELEPHONE QUOTATION CLERK" and

involves working with financial institutions and "Answers telephone calls from customers requesting current stock quotations and provides information posted on electronic quote board. Relays calls to REGISTERED REPRESENTATIVE (financial) 250.257-018 as requested by customer. May call customers to inform them of stock quotations." TELEPHONE QUOTATION CLERK, DICOT 237.367-046. This position likely exceeds the mental limitations assigned by the ALJ in Plaintiff's RFC. The code for what the ALJ describes as a "general office clerk" is actually an election clerk who "Compiles and verifies voter lists from official registration records. Requests identification of voters at polling place. Obtains signatures and records names of voters to prevent voting of unauthorized persons. Distributes ballots to voters and answers questions concerning voting procedure. Counts valid ballots and prepares official reports of election results." ELECTION CLERK, DICOT 205.367-030. Again, this position likely exceeds Plaintiff's mental limitations.  The code associated with an "order clerk" is actually a "parlor chaperone," a light duty job requiring six hours of standing or walking in an eight hour day and involves chaperoning young people at social functions. *See* PARLOR CHAPERONE, DICOT 352.667-014 ("Chaperones young people attending social functions held in hotels or restaurants: Greets guests and answers questions regarding program. Arranges for entertainment, such as games, concerts, and motion pictures. Asks guests to observe rules of establishment or reports offenders to HOUSE OFFICER (hotel & rest.). May collect tickets for admission to events.").

More importantly, the DOT states that, for each job identified by the VE, Plaintiff would be required to stand for two hours out of an eight-hour workday. *See* TELEPHONE QUOTATION CLERK, DICOT 237.367-046) (Walking is required occasionally, defined as "activity or condition exists up to 1/3 of the time"); ELECTION CLERK, DICOT 205.367-030 (same); PARLOR CHAPERONE, DICOT 352.667-014 ("Physical demand requirements are in excess of those for Sedentary Work."). The Court cannot discern whether the ALJ rejected the VE's testimony in favor of the DOT, or simply ignored the conflict. Moreover, the Court cannot discern what positions the VE identified because none of the codes match the titles and one of the codes is for light wok. This precludes meaningful review. Because the Court recommends remand on these grounds, it declines to address Plaintiff's other allegations of error. A remand may produce different results on these claims, making discussion of them moot. *See LaSalle v. Comm'r of Soc. Sec.*, No. CIV.A. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## VII.    Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's

social security disability insurance and supplemental security income benefits be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.      The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: August 21, 2015                   _____s/Gerald B. Cohn_____
                                                         GERALD B. COHN
                                              UNITED STATES MAGISTRATE JUDGE